946 So.2d 490 (2005)
Rex Allen BECKWORTH
v.
STATE of Alabama.
CR-02-1077.
Court of Criminal Appeals of Alabama.
August 26, 2005.
Rehearing Denied December 16, 2005.
Certiorari Denied June 23, 2006.
*495 Scott K. Hedeen, Dothan, for appellant.
William E. Pryor, Jr., and Troy King, attys. gen., and J. Clayton Crenshaw and Stephen Shows, asst. attys. gen., for appellee.
Alabama Supreme Court 1050371.
COBB, Judge.
Rex Allen Beckworth appeals from his capital-murder conviction and death sentence. He was convicted of murder made capital because it was committed during the course of a burglary, a violation of  13A-5-40(a)(4), Ala.Code 1975, for his participation in the beating and shooting death of 87-year-old Bessie Lee Thweatt while she was in her home. The jury recommended by a 10-2 vote that Beckworth be punished by death; the trial court sentenced Beckworth to death. This appeal followed.
The evidence presented at trial tended to show the following. In the early morning hours of January 10, 2000, Rex Allen Beckworth and his younger half brother, James Walker, broke into the home of Bessie Lee Thweatt, an 87-year-old widow who lived alone in the house in which she had resided for 67 years. At the time of her death, Thweatt was 5 feet, 1 inch tall, and she weighed 112 pounds. Thweatt was beaten and shot in the head; her house was ransacked.[1] On January 10, 2000, family members of Bessie Thweatt discovered that the back window of the Ford automobile she drove, which was parked in the carport by her house, and a picture window on the back of her house had been broken. A light in Thweatt's carport had been broken out and the exterior telephone lines to her house had been cut. One of Thweatt's family members, Buford Fortson, stepped onto a cement *496 block that was in front of the broken picture window and climbed into the house to look for Thweatt. Another cement block was inside the house, near the window, and broken glass from the window was inside the house. Fortson called Thweatt's name and looked for her, but Thweatt did not answer. The dining room had been ransacked and furniture had been tossed around. Fortson testified that the door between the dining room and the kitchen had been kicked in; a footprint had been left on the door. The kitchen had been ransacked, and clothing and other items were littered all over the floors throughout the house. Thweatt was found, dead, on the floor of the kitchen. Her back was by the locked door to the carport and her head was against the kitchen counter. Buford testified that Thweatt's face was "a hundred percent covered with blood" and that her hands were also bloody. (R. 290.) The authorities were summoned, and they investigated the murder. The jury viewed photographs and a videotape of the crime scene.
Gary Jenkins, an investigator with the Houston County Sheriff's Office, videotaped the crime scene, including the broken light in the carport, the severed telephone lines, and what law-enforcement officers believed to be blood splatter on objects near the victim's body. Jenkins testified that he retrieved a bullet from the frame around the door that separated the dining room and the kitchen in Thweatt's house. Another law-enforcement officer at the scene recovered a .22 caliber shell casing on the dining-room floor of Thweatt's house; the casing was approximately 10 to 12 feet from Thweatt's body. The bullet and casing were sent to the forensics laboratory for testing and comparison. The door between the kitchen and dining room appeared to have been pushed in or kicked in and a footprint had been left on the door. A flashlight battery was found beneath the car in the carport.
Forensic testimony established that Thweatt had sustained more than seven blunt-force injuries to her face and head. The injuries resulted in substantial bleeding and bruising of the skin, indicating that Thweatt was alive when the injuries were inflicted. The injuries also resulted in multiple facial skull fractures, indicating to the forensic pathologist who conducted the autopsy on Thweatt's body that a great amount of force was used to inflict the injuries. The pathologist further testified that Thweatt "must have been in deep pain" as a result of the numerous injuries to her face and head because the skin in these areas has many nerve endings. He later acknowledged, however, that he did not know whether Thweatt was rendered unconscious by the blows to her head. He stated that the blunt-force injuries could have been caused by the muzzle or any other part of a gun. The pathologist testified that Thweatt's death was the result of a gunshot wound to her right eyebrow; the shot was fired at close range. The bullet traveled from the front of her head to the back and from the right side to the left side. The bullet also traveled on a slight downward angle from the top of Thweatt's head; the pathologist testified that it was very unlikely that Thweatt was standing straight up when she was shot. The bullet "tore a hole through her brain and basically separated the two hemispheres, that is, the right and left hemisphere, and impacted upon the back of her head." (R. 352.) The bullet had remained in Thweatt's skull; the pathologist removed the bullet fragments and secured them for forensic testing.
One of Thweatt's grandsons, Mark Peacock, a convicted felon who was incarcerated at the time of trial, testified that he knew Beckworth and that he had spoken *497 with him as they passed time together when they both had "a lot of time" on their hands, approximately three years before the trial. (R. 327, 329.) Peacock had mentioned to Beckworth that his grandmother had farmland around her house and a red 1977 Thunderbird automobile in her yard; Beckworth had indicated to Peacock that he was familiar with the area where Thweatt lived. Peacock also acknowledged that he informed Beckworth, "[M]y grandmother probably has more money than she knows what do to do with." (R. 331.) Testimony from Mary Kelley, Thweatt's daughter, established that Thweatt kept cash in her house and in her vehicle. Upon her death, Thweatt's family learned that she had saved approximately $200,000 in cash.
Chris Hood, a convicted felon who was incarcerated at the time of trial, testified that he knew Beckworth and had spent time with him in November and December 2000. He testified that Beckworth asked him if he could get "a hot gun," one that could not be traced to Hood or to Beckworth. (R. 482.) Beckworth said he wanted the gun for his wife, who was a truck driver. Hood testified that he told Beckworth that he would let Beckworth know if he found such a gun. Hood further testified that Beckworth told him that the best way to kill a person was execution-style. Hood said that, after he heard about the January 10, 2000, slaying of Bessie Lee Thweatt, he contacted local law-enforcement officers and told them about Beckworth. Hood also told the officers that Beckworth had lived in Gadsden.
Angela Lynn Foster, an inmate at the Houston County jail at the time of trial serving a sentence for writing a "bad check," testified that James Walker, Beckworth's codefendant, was her half brother. She testified that, on January 4 or 5, 2000, Walker and Beckworth came to a motel in Dothan where she was employed at the time. She said that Walker was 19 or 20 years old at the time and Beckworth was 34 years old. She said that Beckworth appeared to be the leader, the one who decided what he and Walker would do. Foster testified that she later saw inside the trunk of the car Beckworth was driving; among the items she saw inside the trunk were clothing or a quilt and the barrel of a gun that she believed to be a .22 caliber rifle or shotgun sticking out. (R. 594-95.) Beckworth told her that someone had given him the gun. Foster said that Beckworth had a brother in Gadsden.
On January 21, 2000, a farmer who was crossing a bridge approximately one and one-half miles from Thweatt's house, saw the barrel and stock of a rifle in the water beneath the bridge. (R. 294, 454-55.) Houston County deputies arrived soon after and the farmer assisted them in removing a .22 caliber rifle from the water.
Lt. Donald Valenza of the Houston County Sheriff's Office testified as to evidence he observed at the crime scene. He also testified that James Walker was arrested in Gadsden and that Walker made some statements after his arrest. Beckworth was later arrested in Phoenix, Arizona. Lt. Valenza and another officer traveled to Arizona to arrest Beckworth on capital-murder charges. While they were in the Phoenix airport, Valenza told Beckworth that Walker was in custody and that Beckworth and Walker would not be tried at the same time. Beckworth then told Valenza he wanted to give a statement.
Lt. Valenza said that he had read Beckworth the rights provided in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when he arrested Beckworth, and that he read the rights to him again before he made the statement. Beckworth gave one statement, which Valenza *498 recorded on a pocket recorder, and Beckworth then made a second statement immediately after completing the first one. The tape-recorded statements were played for the jury.
In the first statement, Beckworth stated that, in late December 1999, he and Walker broke into a house and stole a .22 caliber rifle. In the second statement he gave at the airport, Beckworth described the crimes committed against Bessie Thweatt. Beckworth claimed that he and Walker were looking for items to steal so that they could sell them to get money. He said that he thought about this woman living out in the country but that they had no intent to harm her. He said that Thweatt's house had no lights on inside when he and Walker located the residence. Both of them had flashlights, he said. Beckworth said that they looked through the windows but did not see anyone. Beckworth told Walker that he thought he heard someone inside; Beckworth said that he wanted to leave. He said that Walker cut the telephone lines and broke the light in the carport. They threw a concrete block through the window and Walker climbed into the house while carrying the .22 rifle. Beckworth said that he remained outside initially, and he heard Walker fire a shot. Beckworth looked inside but did not see Thweatt; he, too, climbed through the window into the house. Beckworth stated that he told Walker to take Thweatt's purse so they could leave. Thweatt had no money in her purse. Beckworth said that Walker kicked in the door to the kitchen and repeatedly hit Thweatt on the head with the rifle. After the third or fourth blow, Thweatt fell. Beckworth said that he again told Walker that they should leave the house. When Walker hit Thweatt again, Beckworth said, the gun went off and the bullet struck Thweatt. Beckworth said the rifle then broke apart. He said that they did not steal anything from Thweatt's house.
Beckworth said that they threw the butt of the rifle in the woods behind Thweatt's house and threw the rest of the rifle into a creek near Thweatt's house. They went to Gadsden and hid in the area for a day or two. Walker did not want to leave Alabama, so Beckworth left the State without him. Beckworth concluded by stating that he was sorry and that he could not bring "this lady's life back."
Joe Saloom, a forensic scientist specializing in firearms and toolmarks examinations, testified that the shell casing recovered from Thweatt's house had been fired from the rifle that was recovered in the creek near her home. He examined the bullet recovered from Thweatt's head and the bullet recovered from the door frame in her house, but found them to be too damaged to determine whether they had been fired from the rifle. Saloom testified that it was highly unlikely that the rifle would fire if it were struck against a person's head. He stated that if the butt of the rifle had been used to strike a person's forehead, the strike could cause the butt of the rifle to break away from the rest of the gun.
The State rested its case after presenting the foregoing evidence. The defense moved for a directed verdict; the trial court denied that motion. The defense then rested without presenting any evidence. The jury returned a verdict finding Beckworth guilty of capital murder as charged in the indictment. A sentencing hearing was held before the jury.
At the sentencing hearing, the State presented evidence showing that Beckworth was on parole when the murder was committed. Beckworth presented the testimony of Dr. Michael D'Errico, a forensic psychological consultant, who performed *499 various evaluations of Beckworth. Dr. D'Errico testified that his initial evaluation revealed that Beckworth was competent to stand trial. He testified that Beckworth obtained a full scale score of 71 on the Wechsler Adult Intelligence Scale, Third Edition, and that his true intelligence quotient (IQ) would be in a range from 66 to 76 because the test had a "confidence limit" of plus or minus 5 points. (R. 796.) An IQ score of less than 70 indicates mental retardation, Dr. D'Errico stated. He further testified that, because Beckworth's actual IQ might have been below 70, he requested a colleague to administer the Stanford-Binet Intelligence Scale, Fourth Edition, to Beckworth. Beckworth achieved a composite score of 67 on the Stanford-Binet; applying the 3-point confidence limit associated with this test, Dr. D'Errico determined that Beckworth's IQ score would be in the range between 64 and 70. (R. 799.) Dr. D'Errico administered the Wide Range Achievement Test and determined that Beckworth's reading skills were at an eighth-grade level and that his spelling skills and his arithmetic skills were at a fifth-grade level. Dr. D'Errico testified that, along with Beckworth's ex-wife, he completed the Adaptive Behavior Scale, a questionnaire requiring information from someone who knows the individual well and who has observed him or her for an extended period. The results of that test indicated that Beckworth scored comparably to individuals who were mentally retarded.
Dr. D'Errico testified that the determination of mental retardation involves three main criteria. First, the individual must have an IQ score of 70 or below, he said. Second, the individual must have deficits in adaptive functioning in several areas, such as independent living skills and academic skills. Third, the subaverage IQ score and the deficits in adaptive functioning must have been observable before the individual was 18 years old. He stated that, based on all of the tests he administered, he concluded that Beckworth met the criteria for mild mental retardation.
On cross-examination, the prosecutor questioned Dr. D'Errico's credibility by eliciting testimony regarding a previous capital case involving a different defendant in which Dr. D'Errico had found the defendant incompetent to stand trial, while two other experts had determined that he was competent to stand trial and that he had been malingering. Dr. D'Errico acknowledged that the Minnesota Multiphasic Personality Inventory ("MMPI"), which he administered to Beckworth, requires at least a sixth-grade reading level. Dr. D'Errico stated that one of the scores on the test indicated either that Beckworth attempted to appear more psychologically ill than he actually was or that he had trouble understanding some of the questions. (R. 827.)
Also on cross-examination Dr. D'Errico acknowledged that a scoring error had been made on the Wechsler test, that the raw score on one of the subtests should have been higher, and the correct score might have yielded an IQ score one point higher than he had reported.
Dr. D'Errico stated that it was not inconsistent that an individual with a diagnosis of mild mental retardation would acquire a job and a driver's license, as Beckworth did. He stated that it was also possible for a person diagnosed with mild mental retardation to engage in falsifying documents on the job so that he could obtain more money. Dr. D'Errico testified also that Beckworth told him that had obtained a general educational development ("GED") certificate, but that Beckworth's former wife stated that he had not received a GED certificate. Dr. D'Errico testified that he was aware that Beckworth had attended a technical college, *500 where he earned A's and B's in refrigeration and electrical courses.
During the State's case at sentencing, Kurt Valley, a former employer of Beckworth's, testified that Beckworth had diagnosed the problems in and repaired janitorial equipment. Beckworth obtained a commercial driver's license (CDL) while he was employed by Valley. Thereafter, Beckworth was promoted, and he began working with customers on the road. During that time, Beckworth had to complete documents and submit them to the company's office. Valley testified that Beckworth did not appear to be retarded.
Mike Tabor testified that Beckworth had worked for him at his pest-control company as a termite technician in 1992 and 1993. Beckworth's responsibilities involved gaining knowledge of insects and toxic chemicals and mixing chemicals safely to treat customers' homes. Tabor stated that Beckworth operated one of the company's trucks and that he did not appear to be retarded.
Dr. Doug McKeown, a clinical and forensic psychologist, testified that he had performed a court-ordered psychological evaluation of Beckworth. He had reviewed the documents from the criminal investigation, the tests that Dr. D'Errico had administered to Beckworth, and the psychological reports that had been completed, and he spoke with Beckworth. Dr. McKeown testified that Beckworth was not mentally retarded. He testified that, in light of Beckworth's employment history, his education at the technical college, and his ability to secure a bank account, a GED, and a commercial driver's license, he determined that Beckworth was not retarded. Beckworth functioned at least within the borderline range of intelligence. (R. 873.)
Dr. McKeown stated that the Stanford-Binet test, the second intelligence test one of Dr. D'Errico's assistants had administered to Beckworth, was not as good as the Wechsler test in measuring a person's overall ability because the Stanford-Binet test had a tendency to suppress the scores of people with less educational experience and weaker verbal skills. Dr. McKeown testified that a scoring error had been made on one of the subtests of the Wechsler test, and that the error elevated Beckworth's IQ score by "a couple of points." (R. 862.) The corrected score on the Wechsler IQ test was 73. (R. 884.)
On rebuttal, the defense presented the testimony of Carol Gobbel, Beckworth's former wife. She testified that she had been married to Beckworth for four years, and she described him as "very caring, very attentive." (R. 897.) Gobbel testified that she and Beckworth had a daughter and that Beckworth was a loving father who helped take care of his child. Gobbel said that she and Beckworth attempted to adopt two of his young nephews so they would not have to live in foster care. Even after Gobbel and Beckworth divorced and Gobbel remarried, she saw Beckworth nearly every day because he continued to visit their daughter. Gobbel testified as to Beckworth's work history, his education at the technical college, and his life skills, including his ability to read and write and to distinguish between right and wrong.
After the attorneys presented their closing arguments to the jury, the court charged the jury and presented jurors with two verdict forms. The first form required the jury to provide a recommendation as to the sentence Beckworth should receive. The second form required the jurors to state whether Beckworth was mentally retarded. The court specifically charged the jury on the definition of mental retardation from the American Association of Mental Retardation.
*501 The jury recommended, by a 10-2 vote, that the death penalty be imposed. The jury unanimously found that Beckworth was not mentally retarded. (R. 1008.)
On October 28, 2002, after receiving a presentence report, the trial court held a separate sentencing hearing in accordance with  13A-5-47, Ala.Code 1975. No evidence was presented at the hearing. The trial court stated that it had considered the jury's sentencing recommendation and, like the jury, had determined that the aggravating circumstances outweighed the mitigating circumstances and that the death sentence should be imposed. Thereafter, the trial court filed a written sentencing order. The trial court stated that the State had established three aggravating circumstances: that the capital offense was committed while Beckworth was engaged in a burglary,  13A-5-49(4), Ala. Code 1975; that the offense was committed while Beckworth was under a sentence of imprisonment,  13A-5-49(1), Ala.Code 1975; and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses,  13A-5-49(8), Ala.Code 1975. (C. 991.) The trial court found that no statutory mitigating circumstances existed.  13A-5-51, Ala.Code 1975. The trial court found, as nonstatutory mitigating circumstances pursuant to  13A-5-52, Ala.Code 1975, that Beckworth "displayed a respectful demeanor during the trial," that he had attended his family's church, and that he loved his family and was loved by his family members. (C. 994.) The court considered the jury's verdict, weighed the aggravating and mitigating circumstances, and found that the aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate sentence.  13A-5-47(e), Ala.Code 1975.
On February 18, 2003, the trial court held a hearing on Beckworth's motion for a new trial.[2] The trial court denied the motion. This appeal followed.

Standard of Review
In every case in which the death penalty is imposed, this Court must review the record for any plain error. Plain error has been defined as a defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), *502 rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001). Beckworth's failure to object at trial to claims now raised on appeal will not preclude review of the issues, but it will weigh against any claim of error. E.g., Irwin v. State, 940 So.2d 331, 341 (Ala.Crim.App.2005). "`[This] plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982))." Barber v. State, [Ms. CR-03-0737, May 27, 2005] ___ So.2d ___, ___ (Ala.Crim.App.2005).

I.
Beckworth first argues that the trial court erred by denying his request for funds to hire a mitigation expert and also by limiting his presentation of mitigating evidence during the sentencing phase of his trial. We disagree.

A.
Beckworth first argues that the principles of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), were violated when the trial court denied his requests for funds to hire a mitigation expert to assist him in the sentencing phase of trial, and he lists various characteristics of his family and his upbringing that he argues constituted relevant mitigation evidence that was not presented. The State contends that the trial court did not err when it denied the request for funds and that the trial court had correctly determined that Beckworth could introduce the evidence through family witnesses.
Beckworth filed an ex parte motion seeking funds to hire a mitigation specialist, stating he was entitled to present, and to have the sentencing jury consider, aspects of his background and character that might be mitigating. He argued that "a comprehensive investigation must be undertaken of Mr. Beckworth's entire life," including his educational, medical, and social history, and he requested $6,500 to secure the services of the Alabama Prison Project to complete this investigation. (C. 385-89.) At a hearing on pending motions, the trial court asked defense counsel to provide any specific legal authority that supported his request for funds for the mitigation expert. (3/18/02 hearing, R. 22.)[3]
Defense counsel filed a memorandum of law supporting presentation of mitigation evidence. (C. 488-91.) In that motion, counsel cited Hodges v. State, 856 So.2d 875 (Ala.Crim. App.2001), aff'd, 856 So.2d 936 (Ala.2003), and other cases for the proposition that a difficult family history has been considered a mitigating circumstance in capital-murder cases. Counsel also included a list of possible mitigation evidence received in interviews of Beckworth and of Beckworth's mother and ex-wife. Thereafter, the trial court denied the motion for funds, stating that the proposed mitigation could be adequately presented through the testimony of family members. (C. 492.) Defense counsel filed a motion seeking reconsideration of the trial court's denial of the request for funds to hire a mitigation expert. (C. 505-33.) *503 The record does not reflect that the trial court ruled on the motion for reconsideration.
Defendants may be eligible to receive funds to hire certain experts to facilitate the formulation and presentation of a defense. Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The funds, however, are not to be granted automatically upon request. Rather, the grant or denial of such funds is a matter for the trial court's discretion and is based on the allegations in the request for funds to hire the expert.
"Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense."
Ex parte Moody, 684 So.2d 114, 119 (Ala. 1996).
In Hodges v. State, 856 So.2d 875, 915 (Ala.Crim. App.2001), we examined several cases in which funds had been requested to hire experts.
"As the Alabama Supreme Court stated in Dobyne v. State, 672 So.2d 1354 (Ala.1995):
"`[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. Dubose [v. State], 662 So.2d [1189,] 1191 [(Ala.1995)]; see also, Smith v. State, 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); McLeod v. State, 581 So.2d 1144 (Ala.Cr.App. 1990); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Stewart v. State, 562 So.2d 1365 (Ala.Cr.App. 1989); McGahee v. State, 554 So.2d 454 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989).
"`. . . .
"`As we stated in Dubose, a defendant seeking expert assistance must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. Dobyne failed to make such a showing. Dubose involved "critical" DNA evidence that directly linked Dubose to the crime. This Court held that Dubose had made an adequate showing of the need for the requested services of a DNA expert. Here, Dobyne requested funds to hire a neurologist to present evidence of mitigating circumstances at the penalty phase of the trial. While we agree that there can be a need for expert assistance at the penalty phase of a capital trial, Dobyne has not shown that the denial of funds to hire a neurologist resulted in unfairness to him.'

*504 "672 So.2d at 1357-59. Hodges failed to show that his trial was fundamentally unfair because of the failure of the trial court to approve funds for experts. Therefore, the trial court correctly held that Hodges failed to meet his burden of showing that he was entitled to state funds."
As was found in Hodges and in the cases cited therein, we find that Beckworth did not establish that the mitigation specialist would have assisted his defense or that the denial of the funds would render his trial fundamentally unfair. See also Lee v. State, 898 So.2d 790, 853 (Ala.Crim.App.2001)("Similarly, in this case, the appellant did not make a threshold showing that either of the requested experts would probably assist his defense and that the denial of funds to hire the experts would result in a fundamentally unfair trial. Rather, he simply speculated that the experts would assist his defense. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his requests for expert assistance.") Beckworth had argued to the trial court that a mitigation expert would have investigated his life history, including his father's abuse of his mother and his siblings, his mother's abandonment of the family, and the level of dysfunction in the family. The trial court correctly determined that all of this evidence was available from Beckworth and his family. Unlike Ake, which involved a request for a psychiatrist to prove an insanity defense, or Dubose v. State, 662 So.2d 1189 (Ala. 1995), which involved a request for a DNA expert to challenge the foundation of the State's case and to establish a critical element of the defense, Beckworth sought expert assistance with evidence already known and available to him through his own knowledge and experience and through the testimony of his family members. He failed to establish that the requested expert was "absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense." Ex parte Moody, 684 So.2d at 119. The denial of the requested funds did not render Beckworth's trial fundamentally unfair. Therefore, we find no merit to this portion of Beckworth's claim; he is entitled to no relief.

B.
Beckworth contends that the trial court erred to reversal when it improperly precluded him from presenting evidence during the sentencing phase of his trial. Specifically, he argues that the trial court prevented him from establishing, through the testimony of his ex-wife, facts about his feelings for his father and about his father's recent arrest for alleged sexual abuse of Beckworth's daughter. He contends that the trial court's rulings violated his right to fully develop and present all relevant mitigating evidence in violation of Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), and cases cited therein. The State contends that the trial court did not err when it excluded some of Beckworth's proffered evidence because, it argues, that evidence was not relevant and much of the evidence was admitted through the testimony of witnesses at the sentencing hearing. We agree with the State.
The United States Supreme Court had declared that a defendant convicted of capital murder must be allowed to present at the sentencing hearing a broad range of proposed mitigating evidence. The Court held:
"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any *505 aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)(footnotes omitted).
By statute, Alabama law allows a broad spectrum of evidence to be offered as mitigation:
"In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
 13A-5-52, Ala.Code 1975.
Our Supreme Court has previously stated:
"To determine the appropriate sentence, the sentencer must engage in a `broad inquiry into all relevant mitigating evidence to allow an individualized determination.' Buchanan v. Angelone, 522 U.S. 269, 276 (1998). Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978). See 13A-5-45(g), Ala.Code 1975 (`The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.'). `[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' California v. Brown, 479 U.S. 538 (1987) (O'Connor, J., concurring specially)."
Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d at ___.
Evidence proffered in mitigation by the defendant must be relevant, however, and the determination of relevance is a decision for the trial court to make in the sound exercise of its discretion. Knotts v. State, 686 So.2d 431, 444 (Ala.Crim.App. 1995), aff'd, 686 So.2d 486 (Ala.1996). We stated in Knotts:
"The determination of the relevancy of evidence lies within the sound discretion of the trial court. Borden v. State, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, McElroy's Alabama Evidence,  21.01(6) (4th ed.1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant's character or record and any circumstances pertaining to the offenses. The question before us is whether the trial court abused its discretion in refusing to admit evidence pertaining to members of the appellant's family. We find that although the offered evidence may have had some slight probative value, the trial court did not abuse its discretion in refusing to allow its admission under the facts and circumstances existing here. The trial court admitted all records offered for purposes of mitigation pertaining specifically to the appellant.
"Furthermore, even if the trial court's ruling was erroneous, we do not believe the error injuriously affected the substantial rights of this appellant. Matters in the excluded records pertaining to the appellant's home and family were admitted in evidence through other records and through the testimony of numerous witnesses, thus making the evidence in the excluded *506 records cumulative. The appellant's sister testified at the sentencing hearing about the home and family life of the appellant. Thus, if error occurred, at all, it was harmless. See Ala. R.App.P. 45; McMahon v. State, 560 So.2d 1094 (Ala.Cr.App. 1989)."
Id. See also Ex parte Hodges, 856 So.2d 936, 945-48 (Ala.2003)(testimony about defendant's unstable home environment was relevant, but no reversible error occurred when prosecutor's objections to testimony were sustained because the defendant was able to present most of the evidence through later testimony); Windsor v. State, 683 So.2d 1027, 1038-39 (Ala.Crim. App.1994), aff'd, 683 So.2d 1042 (Ala.1996)(trial court erred in excluding hearsay evidence, but no reversal due because similar evidence was presented in later testimony).
With the foregoing principles in mind, we review Beckworth's allegations of error. Beckworth contends that the trial court should have permitted him to question his ex-wife, Carol Gobbel, about how he described his father and his family to her, whether his father had been charged with sexually abusing their daughter, and whether he had threatened her current husband. The prosecutor objected on hearsay grounds to that line of questioning, and the trial court sustained the objections. We note that hearsay is admissible at a capital-sentencing hearing, so long as the hearsay evidence is probative and relevant.  13A-5-45(d), Ala.Code 1975. Nonetheless, for the reasons discussed below, the trial court did not err to reversal when it sustained the objections. See W.T.J. v. State, 665 So.2d 1019, 1022 (Ala. Crim.App.1995)(a trial court's ruling sustaining an objection to evidence will be affirmed on appeal if the excluded evidence was subject to any legal objection).
We note, first of all, that Beckworth did not attempt to present any evidence during his case-in-chief as to his claim that the family in which he was raised was dysfunctional. In his opening statement at the sentencing hearing, defense counsel argued only that Beckworth was mentally retarded, and in his case-in-chief, he presented only the testimony of Dr. D'Errico, who stated that Beckworth was mentally retarded. In its rebuttal case, the State presented the testimony of Dr. Doug McKeown, who had evaluated Beckworth and determined that he was not mentally retarded. Only in his surrebuttal case did Beckworth present testimony about his dysfunctional family and his chaotic upbringing. Furthermore, defense counsel did not mention Beckworth's dysfunctional family as a mitigating circumstance in his closing argument at the sentencing hearing.
"`The trial court properly confines rebuttal, and of course surrebuttal evidence to material within the scope of the preceding adverse evidence.' Ellison v. State, 33 Ala.App. 405, 34 So.2d 185, 187 (Ala.App.1948). `It is within the discretion of the trial court to receive, in rebuttal, testimony which more properly should have been offered as part of the case in chief.' Harris v. State, 409 So.2d 1006, 1010 (Ala.Cr.App.1982). `A trial court is clothed with wide discretion in the matter of permitting surrebuttal evidence, although the court's action in this regard is reviewable on appeal.' Harris, 409 So.2d, at 1010."
Foster v. State, 705 So.2d 534, 540 (Ala. Crim.App. 1997).
Thus, the presentation of evidence regarding Beckworth's chaotic upbringing was not a significant element in his case in mitigation, and the trial court had the discretion to limit its presentation as surrebuttal evidence.
*507 Moreover, Carol Gobbel was permitted to testify in detail about Beckworth's chaotic family circumstances, that his father had been in jail when they began dating and when they married, and she even testified that the stress caused by Beckworth's involvement with his dysfunctional family caused their marriage to end. (R. 902-07.) Gobbel testified that their daughter had been sexually abused, that Beckworth had threatened her husband, and that Beckworth had a rocky relationship with his father, a man Gobbel described as "creepy" and as reminding her of the man who had sexually abused her as a child. Thus, Beckworth was able to present, through his questions to Gobbel, most of the evidence he now claims was improperly excluded. Ex parte Hodges, 856 So.2d 936, 945-48 (Ala.2003).
The single piece of evidence that was not otherwise testified toÔÇöthat Beckworth's father was currently charged with sexually abusing Beckworth's daughterÔÇöwas properly excluded because it was irrelevant. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), held that a defendant must be permitted to present evidence regarding any aspect of his character or his record and any of the circumstances of the offense. Evidence of the charges pending against Beckworth's father at the time of Beckworth's trial had nothing to do with Beckworth's own upbringing or with his character or record. While pending charges against his father would have been very disturbing to Beckworth, he has never alleged that his distress over the charges was somehow related to his involvement in the murder of Bessie Lee Thweatt.[4] Moreover, as the Alabama Supreme Court noted in Ex parte Hodges, supra, the weight to be afforded to the "difficult family history" mitigating circumstance depends upon the defendant's age. Beckworth was 33 years old at the time this murder was committed and he had a family of his own. Additional evidence about his chaotic upbringing decades earlier would have been entitled to little weight as mitigation for this crime.
In summary, we find no error in the trial court's rulings. A majority of the evidence to which the prosecutor objected was admitted during subsequent testimony; the evidence regarding Beckworth's family circumstances was not offered in his case-in-chief and was never argued to the jury as a mitigating circumstance; that Beckworth's father had been charged in the sexual abuse of Beckworth's daughter was properly excluded because it was irrelevant; there was no logical nexus between those charges and Beckworth's murder of Thweatt. Beckworth is not entitled to any relief on this claim.

II.
Beckworth argues that the trial court erred in failing to find that he was mentally retarded. He also argues that the jury instruction on mental retardation incorrectly placed the burden of proof of his mental capabilities on him. Finally, Beckworth requests this Court to adopt a specific standard for determining mental retardation.[5]
In his brief on the issue of whether he was mentally retarded, Beckworth quotes large portions of the testimony of Dr. D'Errico and Dr. McKeown regarding his *508 performance on the tests and their opinions about whether Beckworth was retarded. He next quotes a portion of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), regarding the definition of mental retardation provided by the American Association of Mental Retardation (AAMR). He then states, "Beckworth asks this court to adopt the AAMR criteria as Alabama's criteria to determine mental retardation in capital murder cases." (Beckworth's brief at p. 71.) As to his argument on the trial court's allegedly incorrect determination that Beckworth is not mentally retarded, his entire argument states:
"Beckworth met the criteria for mental retardation under Atkins and the AAMR. The denial of the trial court to find him so deprived Beckworth of his rights as set out in the Fourth, Fifth, Sixth, Eighth and Fourteenth amendments to the United States Constitution and the rights set out in Article 1, Sections 1, 5, 6, 7, 8, 9, 11, 13, 15 and 16 of the Alabama Constitution."
(Beckworth's brief at p. 71.) Although we do not find Beckworth's argument to be sufficient under Rule 28(a)(10), Ala. R.App. P., because it does not contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefore, with citations to the cases, statutes, other authorities, and parts of the record relied on," because Beckworth does, in his reply brief, present some additional discussion on the issues, we are able to address the claims.

A.
Beckworth first argues that the trial court erred when it found that he was not mentally retarded. He appears to argue that the court should have accepted the opinion of the defense expert, who determined that Beckworth was mentally retarded.
In Atkins v. Virginia, the United States Supreme Court held:
"We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender."
Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
As Alabama's appellate courts have reviewed cases in which capital defendants have argued that they are mentally retarded, certain standards have been consistently applied:
"The Court [in Atkins] did not define a legal standard for mental retardation, but left the definition of the term and the enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute to address the holding in Atkins. The only Alabama statute that provides assistance in making this determination is  15-24-2(3), Ala.Code 1975, which defines a `mentally retarded person' as `[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.'
"The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002), in determining whether the appellant was mentally retarded and therefore not subject to execution, applied the broadest definition of mental retardation recognized in those states that prohibit the *509 execution of the mentally retarded. The Court stated:
"`Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).'"
Yeomans v. State, 898 So.2d 878, 901 (Ala. Crim.App. 2004). See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala.2003)("Because the Legislature has not had an occasion to address this State's policy regarding mentally retarded capital defendants and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we have conducted our review in light of the most liberal definitions considered by the United States Supreme Court in reaching its holding in Atkins and as defined by statutes in those states that prohibit the imposition of the death sentence on a mentally retarded defendant." (Footnote omitted.))
The trial court in this case applied the factors set forth in Ex parte Perkins and determined that Beckworth was not mentally retarded.[6] The evidence fully supports the trial court's determination.
The trial court made the following written findings in the sentencing order:
"The defense raised as a sentencing issue the question of whether or not Mr. Beckworth was mentally retarded in light of the U.S. Supreme Court ruling in the [Atkins case] prohibiting execution of a mentally retarded person. The Jury and Court heard experts on the issue as well as testimony and evidence of the defendant's abilities. Although his exact tested mental ability was an issue, he appeared to function normally in his personal life and out in society, held a job as a mechanic on refrigeration or other systems for Houston Paper Company and its customers. Mr. Beckworth represented to others that he had a GED. He earned A's and B's at Sparks Technical College in the area of mechanical repair. He was married, had a child and had a commercial drivers license. The Jury found that he was not mentally retarded and the Court agrees."
(C. 994.)
Applying the standards discussed in Ex parte Perkins, 851 So.2d 453 (Ala.2002), *510 and its progeny, we do not hesitate to uphold the trial court's determination that Beckworth was not mentally retarded. First, we note that no testimony was presented to establish that any of Beckworth's alleged deficits manifested themselves before Beckworth was 18 years old. Second, as set forth in the trial court's order and in this Court's detailed recitation of the testimony presented at the sentencing hearing, Beckworth did not suffer from significant deficits in adaptive behavior. The testimony established that Beckworth had a consistent employment history at jobs requiring a variety of skills and technical training; that he had acquired a commercial driver's license; that he had attended a technical college where he earned A's and B's; and that he had supported his immediate family and, occasionally, some of his relatives and had even considered adopting his niece's two young twins because the boys had been placed in foster care. The trial court's determination that Beckworth did not suffer substantial deficits in adaptive functioning is fully supported by the record.
Finally, although Beckworth's score on one of the intelligence tests given by the defense expert indicated that Beckworth's IQ was below 70, the other test administered by the defense expert, the one which the State's expert testified was a more reliable indicator of Beckworth's intelligence, indicated that Beckworth's IQ was 73. Because Beckworth did not suffer from a significant deficit in adaptive behavior; because there was no evidence that any of the alleged deficits manifested themselves before Beckworth was 18 years old; and because there was evidence that supported a determination that Beckworth did not demonstrate significantly subaverage general intellectual functioning, we can determine that Beckworth, even under the broadest definition of mental retardation, is not mentally retarded. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); Ex parte Perkins, 851 So.2d 453 (Ala.2002).
Based on the foregoing, we are convinced that the trial court did not err when it determined that Beckworth is not mentally retarded.

B.
Beckworth also argues that the jury instruction on mental retardation wrongly placed on him the burden of proving that he was mentally retarded; he argues that the jury should have been instructed that the State bore the burden of proving that he was not mentally retarded. We reject Beckworth's allegation for several reasons.
At the conclusion of the trial court's charge to the jury, Beckworth announced that he was satisfied with the instructions as they were given. (R. 1006.) Therefore, we review this claim for plain error only.
First, as we held in part II.A. of this opinion, the trial court correctly determined that Beckworth is not mentally retarded; therefore, any error in the instruction to the jury would have been harmless. Rule 45, Ala. R.App. P.
Second, nothing in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or in Ex parte Perkins, 851 So. 2d 453 (Ala.2002), requires a jury determination of mental retardation. The trial court, acting without the benefit of any guidance from the Alabama Legislature or the appellate courts as to the procedure to be followed in determining whether a capital defendant is mentally retarded, made an earnest attempt to comply with the recent Atkins decision and presented the retardation issue to the jury in the form of a special interrogatory. Because this procedure is not mandatory, it effectively provided Beckworth with an additional determination *511 on the issue of retardationÔÇöa determination he is not currently entitled to receive under Alabama law. Because a jury determination of the issue was not required, any alleged error in the instruction to the jury on the issue would have been harmless. Rule 45, Ala. R.App. P.
Finally, the trial court instructed the jury in accordance with the AAMR definition of mental retardation and the similar definition provided by the American Psychiatric Association. (R. 1005-006.) The trial court required the jury determination as to the retardation finding to be unanimous. Therefore, the instruction provided to the jury in this case adequately protected Beckworth's constitutional rights.
Beckworth is not entitled to any relief on this claim. His allegation that the jury instruction on retardation was faulty is moot because a jury finding on retardation was not required. Moreover, the instruction given by the trial court provided the definition of mental retardation now used by Alabama courts reviewing claims of mental retardation in capital cases, and it required a unanimous finding by the jury.[7] No error or plain error occurred here.

III.
In his reply brief to this Court, Beckworth argues that, because Alabama's capital-murder statute has no standards or procedures to determine whether a defendant is mentally retarded, it violates Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and is unconstitutional. He also argues that the statute is unconstitutional because, he says, it allows the execution of a mentally retarded defendant. Beckworth argued at a pretrial hearing only that the indictment against him should be dismissed because Alabama's statute allowed the execution of a mentally retarded defendant and because the statute does not provide a procedure for determining whether a capital defendant is retarded (8/15/02 hearing, R. 27-29), so the claim regarding the alleged lack of standards will be reviewed only for plain error. Beckworth argues for the first time on appeal that the AAMR standards for defining mental retardation should be adopted by this Court. The State argues that Alabama's death-penalty statute is not unconstitutional and that this Court need not, and in fact, should not, adopt any particular procedures or standards in order to determine whether a defendant is mentally retarded.

A.
As to his claim that Alabama's death-penalty statute is unconstitutional because it permits the execution of mentally retarded defendants and because it contains no standards for determining whether a defendant is mentally retarded, we find that these allegations of error need not be addressed because we have already held that the trial court correctly determined that Beckworth is not mentally retarded. J.L.N. v. State, 894 So.2d 751 (Ala.2004); Gavin v. State, 891 So.2d 907, 935-38 (Ala.Crim.App.2003)(both cases holding that a defendant cannot challenge the constitutionality of a statute when he cannot show that the statute's alleged unconstitutional feature adversely affected him).
*512 Moreover, even if we were to consider Beckworth's claims regarding the constitutionality of the statute, we would reject them. In Ex parte Perkins, 851 So.2d 453 (Ala.2002), the Alabama Supreme Court reviewed Perkins's claim that he was mentally retarded and held that, even under the broadest definitions considered by the United States Supreme Court in Atkins or as mental retardation is defined by any of the state statutes that prohibit the imposition of the death sentence on a mentally retarded defendant, Perkins was not retarded. Furthermore,  15-24-2(3), Ala.Code 1975, provides assistance in making this determination because it defines a mentally retarded person as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments." Alabama courts are not without procedures and standards for determining whether a defendant is mentally retarded and therefore exempt from capital punishment.[8] Even if Beckworth's claims were properly before us, and they are not, he would not be entitled to any relief.

B.
As to Beckworth's assertion that this Court should adopt the AAMR standard for assessing whether a defendant is mentally retarded, we need not consider this claim. Beckworth is not a mentally retarded defendant, and the adoption of a particular standard for assessing mental retardation is therefore a moot issue. Furthermore, when the Alabama Supreme Court considered whether to establish a procedure for determining whether a capital defendant was mentally retarded, it declined to do so.
"Both Perkins and the State urge this Court to refrain from making policy decisions with regard to claims of mental retardation by capital defendants. We agree that we should so refrain. As the judicial branch of government, this Court can only interpret the law. We urge the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution."
Ex parte Perkins, 851 So.2d 453, 455 n. 1 (Ala.2003).
We are bound by the decisions of the Alabama Supreme Court and we, like that Court, must refrain from adopting the AAMR standard, as suggested by Beckworth, or any other standard.

IV.
Beckworth next argues that reversible error occurred when the prosecutor failed to disclose the aggravating circumstances he intended to prove at the penalty phase, even though the trial court had ordered the prosecutor to do so. The State argues that the trial court denied Beckworth's motion, and that the ruling was correct. We agree with the State.
The record discloses that, on November 13, 2001, Beckworth filed a pleading styled "Demand for Notice of Aggravating Circumstances." (C. 192.) On the face of the pleading is the trial judge's signature and a ruling indicating that, on November 16, 2001, the motion was granted. On December 4, 2001, however, the trial court held a hearing on pending motions. At that hearing, when the court considered the motion, the trial court stated, "I think that is due to be granted. Am I wrong, gentleman?" (12/4/2001 hearing, R. 18.) The prosecutor stated, "Case law says I don't have to give those. Right." (12/4/2001 hearing, R. 18.) *513 The trial court then considers the next pending motion without stating a ruling on that one. On September 12, 2002, after the jury was struck, Beckworth argued that the trial court had ordered the prosecutor to disclose the aggravating circumstances and he objected to the prosecutor's failure to do so. (R. 208-214.) The trial court reviewed the transcript of the December 2001 hearing, and the parties discussed what occurred at the hearing. The trial court then stated that it remembered the hearing and what had occurred with the rulings on the motion. It stated that it had granted the motion before the hearing. The trial court continued:
"But at the hearing, the State pointed out to me that the case law did not support such a ruling, and I should have said `denied,' clearly, but the context . . . is that I went with the State on this thing, because I did not grant the defense's motion at that time."
(R. 215-16.)
Therefore, Beckworth has incorrectly stated that the prosecutor was ordered to disclose the aggravating circumstances and that reversible error occurred because it failed to do so. The record clearly reveals that the trial court's final ruling was a denial of that request. Because the underlying facts do not support the premise for Beckworth's claim, his allegation of error fails, and he is entitled to no relief. Beckworth claims on page 74 of in his brief to this Court that he "then objected to the denial of the motion. (R. 216.)" The record does not support this assertion. Beckworth simply asked the court whether the transcript of the hearing would be in the record. To the extent Beckworth's argument on appeal can be construed as a claim, subject to review for plain error only, that he was entitled to notice of the aggravating circumstances on which the prosecutor intended to rely, we have rejected that claim repeatedly. "`A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances.'" Irvin v. State, 940 So.2d 331, 364 (Ala. Crim.App.2005)(quoting Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997)), and cases cited therein.

V.
Beckworth argues that the trial court erred when, after the jury panel had been sworn, it excused an alternate juror who stated that she had not revealed during voir dire questioning that one of her family members had been convicted of a crime. Beckworth contends that the trial court's action violated  13A-5-44, Ala. Code 1975, which requires two alternate jurors in a capital case. He also argues that the trial court erred further by releasing the alternate juror without asking her any follow-up questions.
The record reveals that, after the jury was empaneled and sworn, the bailiff notified the court that a juror wanted to tell the court that one of her family members had been convicted of a crime.[9] The prosecutor argued that the juror was supposed to have told the truth earlier, during voir dire questioning, and that she should now be excused from service. The court agreed and stated that the only question was whether to attempt to substitute another alternate in her place. The prosecutor then stated, "Or just go with thirteen," and the trial court agreed that they could proceed with thirteen jurors. (R. 219.) *514 The prosecutor noted his agreement with that solution, and the trial court released the juror from duty. Defense counsel objected.
Beckworth now argues that he is entitled to a new trial because he proceeded to trial with only one alternate juror, in violation of  13A-5-44(a), Ala.Code 1975, which states that the jury selected in a capital case shall include two alternate jurors. We disagree. Even if the trial court's decision to excuse the juror for her failure to answer a question during voir dire was error, we would find any error to be harmless. The 12 jurors who were selected in Beckworth's case heard all of the evidence and deliberated as a group to decide his guilt and to recommend his sentence. No alternate jurors were needed or called into service. Even if the trial court erred by dismissing the alternate juror, in this case it would have been error without injury and would not warrant a reversal. Rule 45, Ala. R.App. P.
Beckworth is not entitled to any relief on this claim.

VI.
Beckworth next argues that the trial court erred to reversal because it asked the prospective jurors if any of them would be unable to recommend a death sentence, even if they were convinced "beyond a reasonable doubt" that the death penalty was warranted. He argues that the question incorrectly incorporated the "beyond a reasonable doubt" standard, which applies only to aggravating circumstance findings. He concludes his brief argument on this issue by stating, "The trial court's instruction to the jury was contrary to the law under which Beckworth was indicted." (Beckworth's brief at p. 82.) The State correctly points out that the jury was not "instructed" improperly as to the law relevant to sentencing because the issue before us involves only the court's questions to the venire. The State also correctly notes that Beckworth did not object to the questions at trial, so the claim is reviewed now only for plain error.[10] We find no plain error.
Beckworth does not argue that the trial court could not "death-qualify" the veniremembers. The United State Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), upheld this practice and Alabama's appellate courts have upheld the "death-qualification" of veniremembers. See Gamble v. State, 791 So.2d 409, 426 (Ala. Crim.App.2000), and cases cited therein. To the extent Beckworth is attempting to argue that the trial court's voir dire questions to the venire should be reviewed as if they were instructions given to the jury at the sentencing hearing, Beckworth has presented this Court with no legal authority to support that proposition, and we decline to consider it.
"The purpose of voir dire is to provide sufficient information on the jurors to enable the trial court to make a meaningful determination as to whether the veniremembers could be impartial." Pressley v. State, 770 So.2d 115, 124 (Ala. Crim.App. 1999), aff'd, 770 So.2d 143 (Ala. 2000). The trial court in this case was "death-qualifying" the venire to determine whether any member would be unable to recommend a death sentence or if any member had a fixed opinion against the death penalty. The court also asked the venire whether any member would be unable to recommend a sentence of life without *515 parole, "even though you were convinced beyond a reasonable doubt that that was the sentence that was warranted in this case?" (R. 23.) While the trial court incorrectly placed language "beyond a reasonable doubt" in its "life-qualifying" questions and in its "death-qualifying" questions, we find no plain error here. Beckworth has cited no authority, and our research has revealed none, to support a determination that a reference to an incorrect standard of review during voir dire questioning requires a reversal for a new trial.
The trial court, in its introductory questioning, was attempting to identify veniremembers who would be unable to render an impartial sentencing recommendation so that these veniremembers could be questioned individually by the attorneys in their follow-up examinations. That the trial court stated an incorrect burden of proof during its introductory questioning resulted in no harm to Beckworth, especially in light of the fact that the trial court correctly instructed the sentencing jury that it could return a death-penalty recommendation only if the aggravating circumstances outweighed the mitigating circumstances. (R. 992-93, 1003.)
No plain error occurred here, and Beckworth is not entitled to any relief on this claim.

VII.
Beckworth next argues that Alabama's capital-murder statutory scheme is unconstitutional. Specifically, he appears to argue that the Alabama statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Beckworth raised this claim in the court below. (C. 678-89, 722-35.) Beckworth acknowledges in his brief that the Alabama Supreme Court rejected this claim in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); he argues that that decision is "constitutionally flawed both on its face and in its use." (Beckworth's brief at p. 83.)
The State correctly argues that this Court is bound by the decisions of the Alabama Supreme Court.  12-3-16, Ala. Code 1975. Even if we were persuaded by Beckworth's arguments on this issue, and we are not, we could not somehow issue a ruling in opposition to Ex parte Waldrop. See Barber v. State, [Ms. CR-03-0737, May 27, 2005] ___ So.2d ___, ___ (Ala. Crim.App.2005).

VIII.
Beckworth next argues that the trial court erred in denying his motion to suppress. Specifically, he alleges that the State failed to establish that he was legally taken into custody in Arizona before he gave his statement to the Alabama authorities, that he was mentally retarded, and that he was denied his right to counsel even though he had asked for an attorney during questioning.
Confessions and inculpatory statements are inadmissible unless the State proves that the defendant was informed of his Miranda rights and that he or she waived them, and that the confession was voluntarily given. E.g., Maxwell v. State, 828 So.2d 347, 354 (Ala.Crim.App. 2000). "Further, when determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession. Maples [v. State, 758 So.2d 1, 41 (Ala.Crim. App.1999).]" Id.
"In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. `When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed *516 to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); `[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make `"all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley, 494 So.2d at 761. `[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. . . . Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' Sheely v. State, 629 So.2d 23, 29 (Ala. Crim.App.1993) (citations omitted). . . . A trial court's ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala. Crim.App.2000)."
State v. Hargett, 935 So.2d 1200, 1203-04 (Ala.Crim.App.2005).
Beckworth filed a motion to suppress the inculpatory statements he gave to Alabama investigators on December 20, 2000, while he was in the Phoenix, Arizona, airport. (C. 366-67.) He alleged in the motion that he did not knowingly and intelligently waive his right to counsel before he gave the statements. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court held a hearing on the motion and heard the testimony of the investigator who took the statements and the testimony of Beckworth himself. The trial court denied the motion. (1/8/02 hearing, R. 52.) Beckworth later filed a motion to reconsider the trial court's ruling. In that motion, Beckworth argued: "The introduction of a wrongly obtained statement from a defendant, whether suffering from mental retardation [or] not, compels the defendant to testify at his trial to explain away that evidence." (C. 797.) He argued that the risk of being compelled to testify is "exponentially greater" for defendants who are mentally retarded. (C. 798.) Although Beckworth did not allege in his motion that he is mentally retarded, he cited Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his motion to reconsider. At the hearing on the motion, Beckworth alleged that the statements should be suppressed because he is mentally retarded. The trial court denied the motion. (8/15/02 hearing, R. 58-59.) Beckworth's tape-recorded statements were admitted into evidence and played for the jury at trial. (R. 654-55.)
At the hearing on the motion to suppress, Lt. Donald Valenza of the Houston County Sheriff's Department testified. (8/15/02 hearing, R. 6-24.) Lt. Valenza stated that he and Investigator Eric Sewell[11] traveled to Arizona on December 19, 2000, to extradite Beckworth to Alabama. He stated that Beckworth had been arrested on December 17, 2000. Lt. Valenza testified that, on December 20, 2000, when he and Sewell took custody of Beckworth, Beckworth did not appear to be under the influence of drugs or alcohol. While Beckworth and the investigators were in a lounge-restaurant area at the Phoenix airport, Lt. Valenza advised Beckworth of his Miranda rights. Lt. Valenza said that Beckworth was not threatened, nor was he offered any inducement to make a statement. Beckworth said he understood his rights and he waived them; he gave two statements to the investigators *517 and both statements were tape recorded. The tape-recorded statements were played for the trial court.
Beckworth testified on his behalf. (8/15/02 hearing, R. 31-44.) He stated that he informed the investigators three times that he wanted to speak to an attorney. He stated that, while he was still in the jail in Phoenix, he informed Lt. Valenza and Sewell that he wanted to speak to an attorney. Beckworth testified that, at the Phoenix airport, he told Sewell that he wanted to talk to an attorney; Lt. Valenza was not with them when he made this request, he said. Finally, Beckworth said that, while they were in the airport restaurant-lounge, he asked both investigators to be allowed to speak to an attorney.
On cross-examination, Beckworth acknowledged that he had seen the transcripts of the statements he gave to the investigators, and he further acknowledged that nowhere in the transcripts was there an indication that he had requested counsel. Beckworth stated that he was not under the influence of drugs or alcohol when he made the statements. He said he understood what Lt. Valenza said to him, and he was not threatened or induced to make the statements.
On redirect examination, Lt. Valenza testified that Beckworth never asked for an attorney. In response to questions from the court, Lt. Valenza testified that he was never out of sight of Beckworth and that he did not observe any conversation between Beckworth and Sewell that might have indicated that Beckworth was asking Sewell for an attorney.
After considering the testimony, the tape-recorded statements, and the arguments of counsel, the trial court denied the motion to suppress. (8/15/02 hearing, R. 52.) After reviewing the record as to this issue and listening to Beckworth's tape-recorded statements, we affirm the trial court's ruling on the motion.
The testimony at the suppression hearing and the tape recording of Beckworth's statements establish that Beckworth was informed repeatedly of his Miranda rights and that he waived those rights each time. Although the evidence as to whether Beckworth requested an attorney is conflicting, the trial court was in a better position to judge the credibility of the witnesses and to determine whether Beckworth had requested an attorney before or during questioning. We find no abuse of discretion in the trial court's resolution of that conflict in the evidence. By his own admission, Beckworth was not under the influence of drugs or alcohol and he was not coerced or threatened into making the statements. The trial judge's finding of voluntariness is fully supported by the evidence.
As to Beckworth's assertion that the trial court should have reconsidered the denial of the motion to suppress because Beckworth is mentally retarded, we disagree. First, as we held in Part II of this opinion, Beckworth is not mentally retarded. Second, even though Beckworth's IQ is below average, that factor alone would not render his confessions involuntary. We held in Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), that a defendant's low IQ does not preclude a finding that a Miranda waiver was voluntary unless the defendant is so mentally impaired that he did not understand his Miranda rights. We have listened to Beckworth's tape-recorded statements and have read his testimony at the suppression hearing; it is abundantly clear that his subaverage IQ does not justify a finding that his statements were involuntary. The trial court correctly denied the motion to reconsider the denial of the motion to suppress.
*518 Finally, Beckworth claims that the State failed to present evidence to establish why he was taken into custody in Arizona. He appears to argue, as he did at the suppression hearing, that the record does not establish that he received a probable cause hearing in Arizona and, therefore, that his confessions might have been made while he was illegally in custody. Powell v. Nevada, 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994). Beckworth himself testified at the hearing that he was arrested in Arizona on the capital-murder charge. (8/15/02 hearing, R. 35.) The trial court, the prosecutor, and defense counsel later stated that they understood that Beckworth was arrested in Arizona on the Alabama capital-murder charge and that no one maintained otherwise. (8/15/02 hearing, R. 38.) Furthermore, Beckworth was arrested pursuant to an arrest warrant issued after a Houston County grand jury indicted him on the capital-murder charge. (C. 22.) Therefore, Beckworth's reliance on cases requiring a probable-cause hearing following a warrantless arrest is misplaced.
Considering the totality of the circumstances, we find that the trial court's determination of voluntariness was correct. The trial court did not err in denying Beckworth's motion to suppress and his motion to reconsider that ruling. Beckworth's statements were properly admitted at trial, and Beckworth is not entitled to any relief on the claims presented here.

IX.
Beckworth next argues that the trial court erred when it denied his motion for a change of venue. He appears to argue only that the motion should have been granted because 33% of the prospective jurors had heard something about the case.
The legal principles governing review of a trial court's denial of a motion for a change of venue are well established. First, we note that a trial court's ruling on a motion for a change of venue is not to be overturned on appeal absent an abuse of discretion. The ruling on a change-of-venue motion is generally left to the sound discretion of the trial court, because the court is in a better position to evaluate the effect on the venire of any allegedly prejudicial publicity against the defendant. See Wimberly v. State, 934 So.2d 411, 421-22 (Ala.Crim.App.2005), and cases quoted therein.
Section 15-2-20, Ala.Code 1975, provides that a defendant may obtain a change of venue if he demonstrates to the trial court that he cannot receive a fair and impartial trial in the county where he was indicted. "Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, there must be some showing of a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." McWilliams v. United States, 394 F.2d 41, 44 (8th Cir. 1968), quoted in part in Gavin v. State, 891 So.2d 907, 939 (Ala.Crim.App.2003); Whitehead v. State, 777 So.2d 781, 800 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000); and Oryang v. State, 642 So.2d 979, 982 (Ala.Crim.App.1993).
"In Murphy v. Florida, 421 U.S. 794 (1975), we reviewed a trial in which many jurors had heard of the defendant through extensive news coverage. Characterizing our previous cases in which we had overturned a state-court conviction on these grounds as involving `a trial atmosphere that had been utterly corrupted by press coverage,' id., at 798, we recognized:

*519 "`Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
"`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."'
"Id., at 799-800, quoting from Irvin v. Dowd, 366 U.S. 717, 723 (1961)."
Dobbert v. Florida, 432 U.S. 282, 302, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
"`The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966).'" Gavin v. State, 891 So.2d 907, 939 (Ala.Crim.App.2003)(quoting Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App. 1993)). Moreover, "the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive." Ex parte Travis, 776 So.2d 874, 878 (Ala.2000).
"The relevant question is not whether the community remembered the case, but whether the jurors at [a defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant. Irvin [v. Dowd, 366 U.S. 717, 723 (1961)]. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed."
Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).
With the foregoing relevant legal principles in mind, we review the facts and arguments presented here. In Beckworth's November 13, 2001, motion for a change of venue, he alleged that the case had received extensive publicity in the newspapers and on radio and television, and that there existed a widespread community bias against him, as well as "a general feeling" in the community "that he should be sentenced to death." (C. 355.) On March 18, 2002, the trial court held a hearing on the motion, although the parties understood that the court would defer its ruling until after voir dire examination of the potential jurors had been completed. At the hearing, Wayne May, a reporter with a local television station, testified about the coverage the murder investigation had received by his station. He stated that from April 2000, when Beckworth was identified as a suspect, until March 14, 2002, the station had broadcast 150 stories mentioning Beckworth's name. May clarified that his station actually broadcast "probably forty-six different stories," some of which were broadcast three or four times during a single day. (3/18/02 hearing, R. 40-41.) Beckworth was mentioned on "America's Most Wanted," a national television show featuring suspects who had eluded arrest. On cross-examination, Printed copies of the stories were admitted as an exhibit at the hearing. Most of the stories are short, one-half page or less, and they are factual. The stories included information such as that Beckworth was a suspect in the shooting, that he was believed to have left the area, and that he had been apprehended in Phoenix, Arizona. (C. 1274, 1294.)
During voir dire examination, prospective jurors who had heard of the case were questioned individually. (R. 135-172.) Only a few of those prospective jurors remembered details of the crimes, and all but a few veniremembers stated that they would be able to put out of their minds the information they had heard and decide the *520 case based on the evidence presented in the courtroom. Beckworth and the prosecutor moved to strike several prospective jurors who stated that they had already formed an opinion or that they could not set aside the media information they had heard; the trial court struck those jurors. (R. 189-91.)
Defense counsel then argued for a change of venue. He stated that, in addition to the testimony taken at the pretrial hearing, the motion was due to be granted because "at least thirty-three percent of the people that were here today to be potential jurors had had some knowledge of the case, and there were a number of people . . . that were struck specifically for that reason. . . ." (R. 196.) The trial court denied the motion.
Beckworth has utterly failed to establish that the trial court abused its discretion when it denied the motion to suppress. He failed to sustain his burden of proof at trial. Several of the jurors remembered the news reports of the crime, but the relevant question is not whether the community remembered the case, because jurors are not required to be ignorant of the facts. Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). All of the prospective jurors who remembered facts about the case but who were not struck for cause stated that they could impartially judge the case based on the evidence presented at trial. Beckworth failed to establish any juror prejudice against him as a result of the media.
"Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a `trial atmosphere . . . utterly corrupted by press coverage,' Murphy v. Florida, [421 U.S. 794, 798 (1975)]. One who is reasonably suspected of murdering his children cannot expect to remain anonymous."
Dobbert v. Florida, 432 U.S. at 303, 97 S.Ct. 2290.
We find, as did the United States Supreme Court in Dobbert, that Beckworth urges us to presume prejudice here based on the existence of media coverage and the fact that some of the prospective jurors had heard about the crime. There is no legal or logical basis for such a presumption here. Therefore, we hold that the trial court did not err in denying the motion for a change of venue.

X.
Beckworth next argues that the trial court erred when it instructed the jury at the sentencing phase. Specifically, he alleges that the court incorrectly advised the jury that under current Alabama law the jury's sentence was considered a recommendation, but that, because the law was evolving, the jury's sentence could become the actual sentence in the case. (R. 993.) He contends that the court should not have speculated and should have instructed the jury only as to the law that existed at the time of trial. Beckworth did not object to this jury charge, so the claim is reviewed for plain error only. Beckworth's failure to object weighs against any claim of prejudice. E.g., Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002).
We note, first, that Beckworth has cited no legal authority supporting his argument on this issue. Therefore, he has failed to comply with Rule 28(a)(5), Ala. R.App. P. We have conducted our plain-error review of the claim, nonetheless, and we have found no plain error.
It is well established that, when reviewing an allegedly incorrect jury *521 instruction, the appellate court must examine the entire jury charge as a whole; the challenged instruction must not be considered in isolation. E.g., Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001). Under the plain-error standard of review of jury instructions, the relevant inquiry is whether there exists a reasonable likelihood that the jury applied the instruction in an improper manner. Id.
The trial court's oral charge was substantially the same as that set out in the Alabama Pattern Jury Instructions: Criminal for use in the sentencing stage of a capital-murder trial. The court deviated slightly when it instructed the jury that its decision was, under current law, a recommendation, but that because of the continuing evolution of death-penalty law, "you should give your recommendation extreme importance" because the law might change so that the jury's sentence became the actual sentence. (R. 993.) We find no plain error in the trial court's attempt to impress upon the jurors the importance of their sentencing decision. Beckworth certainly could not have been prejudiced by any statement the court made that informed the jurors that their decision was of "extreme importance." Moreover, the trial court correctly instructed the jurors on the existing law and informed them that their decision as to sentencing was a recommendation. The Alabama Supreme Court has stated:
"[D]espite the fact that one segment of the circuit court's jury instructions contained some ambiguity, the law does not necessarily require a reversal of Wood's sentence. In reviewing jury instructions to determine if they correctly set forth the applicable law, a reviewing court must consider the entire charge. Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 384-85 (Ala.1993)."
Ex parte Wood, 715 So.2d 819, 822 (Ala. 1998).
A reasonable reading of the entire charge makes it clear that the jury was correctly informed of the existing law as to its sentencing recommendation. Because the trial court sufficiently instructed the jury that its recommendation was just that ÔÇö a recommendation ÔÇö the jury charge as a whole does not support a finding of plain error here.
We note, additionally, that Beckworth's requested jury charge no. 4 stated, in relevant part:
"Whatever your sentence in this case, life without benefit of parole or death by lethal injection, responsibility for making the decision rests entirely with the jurors.
"Authority: Caldwell v. Mississippi, 86 L.Ed.2d 231 (1985). The case of Mann v. Dugger[,] 844 F.2d 14[4]6 at 1454 (11th Cir.1988)[,] held that any argument by the prosecutor which in any way lessened the jury's grave responsibility in making its recommendation required reversal."
(C. 871.) The trial court refused the instruction, stating that the substance of the instruction would be covered in its oral charge to the jury. (R. 888.)
In Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the United States Supreme Court stated, "[W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Beckworth sought in his requested jury instruction no. 4 to be certain that the trial court did not minimize the jury's awareness of its responsibility. Certainly the instruction now objected to only reinforced for the jury the importance *522 of its decision. It did not mislead the jury as to the current law or "ask the jury to make a decision based on a projected change in the law." (Beckworth's brief at p. 97.) We find no error that "has or probably has adversely affected the substantial right of the appellant." Rule 45A, Ala. R.App. P. Beckworth is not entitled to any relief on his claim.

XI.
Beckworth next argues that the trial court erred when it denied his request for a jury instruction on extending mercy to a defendant during the penalty phase of his trial. Beckworth objected to the court's refusal of this charge, but he did not state any grounds for the objection. (R. 893-94.) Therefore, the issue was not preserved for review, and we review it now for plain error. Burger v. State, 915 So.2d 586, 590 (Ala.Crim.App.2005).
Beckworth's requested jury charge no. 40 read as follows:
"Even if you find one or more aggravating circumstances beyond a reasonable doubt, you may impose a sentence of life in prison without possibility of parole for any reason. You need not find a mitigating circumstance in order to impose a sentence of life imprisonment without parole. Nothing in the law forbids you from extending mercy out of compassion or belief that life imprisonment is sufficient punishment under all the circumstances of this case."
(C. 927.)
This Court has in at least two previous cases reviewed this exact instruction. Melson v. State, 775 So.2d 857, 896-98 (Ala.Crim.App.1999); Rieber v. State, 663 So.2d 985, 995-96 (Ala.Crim.App.1994), aff'd, 663 So.2d 999 (Ala.1995). Each time, we have held that the instruction was clearly an incorrect statement of the law and that the trial court had properly refused to give the instruction.
Having previously determined that trial courts have correctly refused this instruction, we will not find plain error for the trial court's refusal to give the instruction here. Beckworth is not entitled to any relief on his claim.

XII.
Beckworth next argues that the trial court erred when it found the  13A-5-49(8), Ala.Code 1975, aggravating circumstance to exist, because, he says, the crime was not especially heinous, atrocious, or cruel when compared to other capital offenses. He claims that the prosecution failed to establish that Thweatt was conscious and aware when she was beaten and shot. In his motion for a new trial, Beckworth alleged that the State had failed to prove that the crime was especially heinous, atrocious, or cruel and that the court's finding of this aggravating circumstance existed was not supported by the evidence. (C. 1004.) We find no error in the trial court's determination that this crime was especially heinous, atrocious or cruel, as that aggravating circumstance has been defined in Alabama law.
This Court has often stated:
"`When considering whether a particular capital offense was "especially heinous, atrocious or cruel," this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), namely, that the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."' Duke v. State, 889 So.2d [1], 36 [(Ala. Crim.App.2002)]."
Yeomans v. State, 898 So.2d 878, 905 (Ala. Crim.App.2004).
"One factor this Court has considered particularly indicative that a murder is *523 `especially heinous, atrocious or cruel' is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture `must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.' Norris v. State, 793 So.2d 847, 861 (Ala.Crim. App.1999).
"In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the defendant stalked a convenience-store clerk for several days before he walked into the store and shot her during a robbery. There was evidence that the clerk had been aware of his presence and that she was afraid of him. This Court held that the murder was `especially heinous, atrocious or cruel' given, among other things, that the murder was perpetrated under circumstances that caused fear and pain to the victim before death. The Court specifically stated that `evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala. 1989). . . .' 663 So.2d at 1003."
Ex parte Key, 891 So.2d 384, 390 (Ala. 2004).
The sentencing order contains the findings the trial court made in support of its determination that this aggravating circumstance had been established:
"The Court finds that the evidence in this case was that the defendant killed Mrs. Thweatt by shooting her in the head with a rifle after having beaten her about the head to an extent which broke off the stock of the gun. . . . . The evidence was that this 87-year-old victim after encountering the defendants in her dining room fled to the kitchen, sought to shut the door against them but the door was kicked in as evidenced by a shoe print on the dining room side of the door. The victim then fled across the kitchen toward the exterior door to the carport and was near that door probably attempting to save herself when struck repeatedly with the gun, falling, and then shot causing her death. . . . . The victim would have suffered much more fear and pain than a victim who was initially killed by only a gunshot wound. The Court therefore finds that the killing was especially heinous, atrocious, [or] cruel as compared to other capital cases."
(C. 992.)
The trial court's findings are fully supported by the evidence. Although the medical examiner could not state with certainty that Thweatt was conscious when she was repeatedly struck on the face and head, he testified that she was alive when all of the blunt-force injuries were inflicted. She certainly was conscious and aware when the killer rushed toward her and struck at least the first blow to her head with the rifle. The medical examiner testified that Thweatt was struck more than seven times and that she suffered broken bones, bruises, and gashes to her head. She was shot in the face at close range. The medical examiner further stated that the bullet's path indicated that it was unlikely that the victim was standing when she was shot. He testified that the skin has many nerve endings and that Thweatt "must have been in deep pain, because she had more than one injury." (R. 360.)
Beckworth's own testimony at trial indicates that Thweatt was conscious and aware during most of the attack. Beckworth told the investigators that Thweatt ran away from the intruders, that Walker *524 kicked in the kitchen door to get to her, and that she was conscious when she was beaten with the stock of the gun. She fell only after she had been struck several times. The evidence would also permit a reasonable inference that she was conscious when she was shot above her eye at close range. In his statement, Beckworth explained the events, beginning with his entrance into the house, after Walker was inside the house:
"[T]he door shut back[.] I thought he had shot, so I jumped up in the house. This was after he shot, I jumped up in there and I said, `Man just grab her purse man, let's go.' And ahh, he grabbed her purse and there nothing [sic], he went looking through her purse and there wasn't nothing in it. And he kicked the door open. And there was this lady inside this living room. And he run over to where she was at and he was hitting her [with the] butt of the gun. He hit [her] in the head like two or three times. I told him, I said, `Don't beat her with the damn gun dude. Just leave her, let's, let's go, let's go.' And he hit her again and when he hit her about the third or fourth time she fell. And her head was done turning blue and stuff. And I, I was telling him, I said let's go, let's go man, I ain't gone do this, I ain't gone be arrested. And he went to draw back to hit her again, and the gun went off. And when it did it hit her in the head, and the gun just broke apart anyway."
(C. 30; emphasis added.)
Beckworth's own statement provided many of the facts found by the trial court in support of the aggravating circumstance. The 87-year-old widow fled to her kitchen when she saw the intruders in her house. She was near the door to her carport when, according to Beckworth, Walker kicked open the door and ran over to her and began striking her about the head and face with the rifle. As the medical examiner testified, these blows would have been extremely painful, and by Beckworth's own testimony, Thweatt was conscious and standing during many of the blows. That the frail, elderly woman was in fear for her life while she was being bludgeoned is unquestionable. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989)(recognizing that the fear experienced by the victim before death is a significant factor in determining the existence of this aggravating circumstance). That she suffered great fear and realized that her death at the hands of these two younger, heavier, armed men was imminent is a significant factor. Beckworth argues, "The evidence suggests that her death took place over a short period of time in a very small house." (Beckworth's brief at p. 105.) To the extent his argument suggests that the crime was not heinous, atrocious, or cruel because Thweatt did not suffer for hours and because she was only chased through her small house before she was cornered and beaten, we are not persuaded. Rather, the evidence indicates that Thweatt was "in intense fear and [was] aware of, but helpless to prevent, impending death." Norris v. State, 793 So.2d 847, 860 (Ala.Crim.App.1999).
The trial court's determination that the evidence established the  13A-5-49(8) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, is fully supported by the record. No error occurred; Beckworth is not entitled to any relief on this claim.

XIII.
Beckworth next argues that the presentence report contains inaccurate and irrelevant information and that it omitted certain relevant information. At the sentencing hearing before the trial court, *525 Beckworth objected "to anything presented in the presentence report that was not presented to the jury." (S. 4.)[12] Because Beckworth did not object at trial to most of the portions of the report he now challenges on appeal, we review the newly raised claims for plain error. Rule 45A, Ala. R.App. P.
This Court recently summarized the legal principles relevant to our review of claims of error in a presentence report:
"Section 13A-5-47, Ala.Code 1975, specifically states that before a circuit court may sentence a defendant convicted of a capital offense the circuit court must direct that a presentence report be prepared on the defendant. Rule 26.3(b), Ala. R.Crim. P., addresses the contents of the presentence report and states that the report may contain:
"`(1) A statement of the offense and the circumstances surrounding it;
"`(2) A statement of the defendant's prior criminal and juvenile report, if any;
"`(3) A statement of the defendant's educational background;
"`(4) A statement of the defendant's employment background, financial condition, and military record, if any;
"`(5) A statement of the defendant's social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
"`(6) A statement of the defendant's medical and psychological history, if available;
"`(7) Victim Impact Statements; and
"`(8) Any other information required by the court.'
"Here, the circuit court's sentencing order clearly states that each party was given a copy of the presentence report, yet Calhoun never challenged any inaccuracies in the report. Section 13A-5-47(d), Ala.Code 1975, specifically provides that the circuit court must make `written findings of facts summarizing the crime and the defendant's participation in it.' The findings made by the circuit court were clearly based on the evidence presented during the trial, and they did not contain any of the inaccuracies that Calhoun challenges in the presentence report.
"Moreover, Calhoun cites nothing in the circuit court's order that would indicate that the court relied on the now-challenged contents of the presentence report. As this Court stated in Kuenzel v. State, 577 So.2d 474, 528 (Ala.Crim. App.1990), aff'd 577 So.2d 531 (Ala.1991), quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989):
"`"When, as in this case, the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish not only that the disputed information is materially false or unreliable, but also that the sentencing judge relied on the information."'"
Calhoun v. State, 932 So.2d 923, 977 (Ala. Crim.App.2005).
As in Calhoun, Beckworth has not alleged that the trial court relied on any of the disputed information in making its sentencing determination. Nonetheless, we will address each of the items of alleged error Beckworth now raises. The presentence report is in the record at (C. 972-77.)

A.
First, Beckworth argues that the presentence report contains inaccuracies *526 about the judge's name and the number of shell casings found at the crime scene. While the judge's name typed on the form is incorrect, the incorrect name was stricken and the correct name, Judge Edward Jackson, was handwritten on the form. Therefore, the judge's name is correct on the form, and Beckworth's claim has no merit. As to his assertion that the report's reference to shell "casings" being found in the home when only one casing was found, we find that this does not rise to the level of plain error. The evidence at trial established, and the sentencing order states, that two shots were fired in the house. The fact that a casing was recovered was significant because the casing matched the weapon Beckworth had obtained before the murder. The trial court clearly did not rely on the insignificant misstatement in the presentence report. We find no plain error here.

B.
Beckworth next argues that the presentence report erroneously referred to codefendant Walker's confession, which was not presented to the jury. He claims that he was denied a fair opportunity for rebuttal. Because Beckworth did not raise this precise claim at sentencing, we find that it is now to be reviewed only for plain error. We agree with Beckworth that his codefendant's confession should not have been included in the presentence report. We note, however, that at the sentencing hearing, Beckworth made a general objection "to anything presented in the presentence report that was not presented to the jury." (S. 4.) The trial court asked about a specific item, and then said, "Yeah." (S. 5.) Thus, it appears that the trial court agreed not to consider information from the presentence report that was not presented to the jury. The trial court did not refer to Walker's confession in its sentencing order. Rather, the court referred to Beckworth's statement, which was admitted into evidence, and noted that Beckworth admitted that he was in the house at the time of the killing. (C. 993.) Because there is no evidence that the trial court relied on or even considered the codefendant's statement, however, we find no plain error.[13]

C.
Beckworth argues that the presentence report was incomplete because it did not include a copy of the second report submitted by the defense mental health expert, Dr. D'Errico. Nothing in  13A-5-47, Ala.Code 1975, or Rule 26.3, Ala. R.Crim. P., requires the attachment of experts's reports. However, the officer who completed the presentence report attached to that report the initial report completed by Dr. D'Errico and the report completed by the State's expert. (C. 977-89.) Beckworth had the opportunity to offer Dr. D'Errico's second report at the sentencing hearing, but he did not do so. Moreover, the Dr. D'Errico's second report was admitted at trial and was part of the evidence considered by the trial court. No plain error occurred, and Beckworth is not entitled to relief on this claim.

D.
Beckworth next argues that the presentence report should have contained information about the pending charge against Beckworth's father for allegedly sexually abusing Beckworth's daughter. Beckworth *527 did not raise this issue at the sentencing hearing, so we review it for plain error. Rule 26.3(b)(2), Ala. R.Crim. P., provides that the offender's prior criminal history may be included in the presentence report. The Alabama Supreme Court has held that a trial judge may not consider a charge pending against the defendant in determining sentence. Cook v. State, 369 So.2d 1251, 1257 (Ala.1978). We find no legal support, and Beckworth has cited none, for holding that plain error occurred when the probation officer failed to include in the presentence report information about a charge pending against Beckworth's father.[14]
We find no plain error with regard to the presentence report. Beckworth is not entitled to any relief on any of these claims.

XIV.
Beckworth next argues that the trial court made numerous errors in its sentencing order. Beckworth listed many instances of alleged sentencing-order errors in his motion for a new trial, but he has not presented argument on all of those alleged errors in his brief to this Court. Therefore we will address only those allegations of error Beckworth argued in this Court.

A.
Beckworth argues that the trial court erred when it failed to mention in the sentencing order those aggravating circumstances it did not find to exist. He argues that this Court should remand the cause for a correction of the sentencing order. We decline to do so.
In its sentencing order, the trial court stated, "The state has proved beyond a reasonable doubt the existence of three aggravating circumstances. . . ." (C. 991.) The court found the three aggravating circumstances to exist, and it entered fact findings as to each circumstance. The trial court found that the offense was committed while Beckworth was under a sentence of imprisonment, that the offense was committed during the course of a burglary, and that the offense was especially heinous, atrocious or cruel when compared to other capital offenses.  13A-5-49(1), (4), and (8), Ala.Code 1975. Although the trial court's sentencing order is technically deficient because it does not include "specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49," as required by  13A-5-47(d), Ala. Code 1975, we find the technical error to be harmless.
The prosecutor relied on only the three aggravating circumstances at trial. (R. 934-37.) The trial court instructed the jury as to those three aggravating circumstances only. (R. 994-95.) The only reasonable inference from the entire record, including the sentencing order, is that the trial court found the three aggravating circumstances to exist, and found that the other aggravating circumstances did not exist.
In a case presenting identical circumstances, we were able to review the sentencing proceedings without remanding for a correction of the sentence order. Pilley v. State, 930 So.2d 550 (Ala.Crim.App. 2005). We stated:
"However, the court's order does not contain specific written findings concerning the existence or nonexistence of each *528 aggravating circumstance enumerated in  13A-5-49. Instead, the court listed only the aggravating circumstances it found existed: (1) that the capital offense was committed by a person under sentence of imprisonment, and (2) that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of first-degree robbery. These were the only two aggravating circumstances found to exist. Thus, the court's findings with regard to the aggravating circumstances are technically deficient. This Court addressed a similar situation in Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App. 1988), aff'd, 545 So.2d 145 (Ala.1989). There, the trial court's sentencing order made specific written findings as to only the aggravating circumstance it found to be supported by the evidence. Although we found the court's sentencing order to be technically deficient, we found such error to be harmless. . . . "
930 So.2d at 568.
The Alabama Supreme Court has stated, "The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death." Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). In this instance, we are able to review the death sentence based on the trial court's findings as they are written in its sentencing order. No reversible error occurred, and Beckworth is not entitled to any relief on his claim.

B.
Beckworth also argues that the sentencing order does not contain enough facts to support the findings as to the aggravating circumstances. He argues, specifically, that the fact findings do not support the trial court's determination that the crime was especially heinous, atrocious, or cruel, and he cites Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002).
In Part XII of this opinion, we upheld the trial court's finding that the aggravating circumstance found in  13A-5-49(8), Ala.Code 1975, applied to the facts of this case. In Turner, we remanded the cause for the trial court to state facts concerning the victim's pain and suffering, so that we could review the propriety of the finding that the murder was especially heinous, atrocious, or cruel. No remand is necessary here, because, as the portion of the sentencing order quoted in Part XII of this opinion demonstrates, the trial court made specific findings about the elderly victim's being chased through her house and then cornered by the intruders, being savagely beaten when she was unable to escape, falling to the floor, and being shot in the head. These facts, though they occurred during a relatively brief time period, are sufficient to support the aggravating circumstance finding.
To the extent Beckworth challenges the sufficiency of the trial court's facts supporting the remaining aggravating circumstances, we find no error. The  13A-5-49(4), Ala.Code 1975, aggravating circumstance was established by the jury's guilty verdict, and the trial court correctly stated that Beckworth broke into Thweatt's house to steal money and other property. (C. 992.) As to the 13A-5-49(1), Ala.Code 1975, aggravating circumstance, the trial court found that Beckworth was on parole for a felony when the crime was committed. (C. 992.) This finding was established by the evidence presented at trial. (R. 782-83.)
The trial court's written findings in the sentencing order are sufficient. Beckworth is not entitled to any relief on this claim of error.

*529 C.
Beckworth also argues that the trial court's fact findings regarding the  13A-5-51(6), Ala.Code 1975, mitigating circumstance are insufficient. Specifically, he argues that the trial court failed to address the "mental health issue" in light of Simmons v. State, 797 So.2d 1134 (Ala. Crim.App.2000).
In Simmons, we addressed whether the trial court had erred when it found that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements, of law was not substantially impaired and that the  13A-5-51(6) mitigating circumstance did not exist. We stated:
"Conflicting evidence was presented on Simmons's mental health and his ability to appreciate the criminality of his conduct. Consequently, the determination of the existence of this mitigating factor was within the discretion of the trial court. Based on the record before us, we cannot conclude that the trial court erred in not finding the existence of this mitigating circumstance."
797 So.2d at 1183.
We further noted in Simmons the well-established principle that a trial court is required to consider all evidence offered in mitigation, but that whether the evidence is found to be mitigating is within the trial judge's discretion. 797 So.2d at 1181-82. See also Waldrop v. State, 859 So.2d 1138, 1149 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002).
In finding that the  13A-5-51(6) mitigating circumstance did not exist, the trial court stated, "The defendant's account of the crime, although somewhat self-serving at times, taken many months after the shooting was clear and in detail as to alleged circumstances." (C. 993.) This finding satisfies the trial court's burden to consider proffered mitigation, and to enter written findings as to each mitigating circumstance. The principles discussed in Simmons and other cases involving mitigating circumstance findings were not violated. To the extent Beckworth has intended to argue that his alleged mental retardation prevented him from appreciating the criminality of his conduct, we find no error in the trial court's decision to the contrary. No evidence was presented to establish that Beckworth was unaware of the criminality of his actions, or to establish that he was unable to conform his behavior to the requirements of the law.[15] The trial court's findings as to this mitigating circumstance are sufficient; Beckworth is not entitled to relief on this claim.

D.
Beckworth next appears to argue that the trial court erred when it determined that he is not mentally retarded. We fully discussed issues related to Beckworth's alleged mental retardation in Part II of this opinion and reiterate here that the trial court's finding is fully supported by the evidence.
To the extent Beckworth argues that the sentencing order does not disclose whether the trial court considered as nonstatutory mitigation evidence of his possible mental retardation, we disagree. At the beginning of its discussion of mitigating circumstances, the trial court stated, "The Court *530 has considered all of the statutory mitigating circumstances as well as the others raised by the defendant." (C. 992.) After addressing the aggravating circumstances and the statutory and nonstatutory mitigating circumstances, the trial court additionally stated:
"The defense raised as a sentencing issue the question of whether or not Mr. Beckworth was mentally retarded in light of the U.S. Supreme Court ruling in [Atkins v. Virginia, 536 U.S. 304 (2002),] prohibiting execution of a mentally retarded person. The Jury and the Court heard experts on the issue as well as testimony and evidence of the defendant's abilities. Although his exact tested mental ability was an issue, he appeared to function normally in his personal life and out in society, held a job as a mechanic on refrigeration or other systems for Houston Paper Company and its customers. Mr. Beckworth represented to others that he had a GED. He earned A's and B's at Sparks Technical College in the area of mechanical repair. He was married and had a child and had a commercial driver's license. The Jury found that he was not mentally retarded and the Court agrees."
(C. 994.)
The sentencing order clearly indicates that the trial court had considered this proffered mitigation evidence and found that it did not exist. Beckworth is not entitled to any relief on this claim of error.

E.
Beckworth also argues that the trial court made errors in its findings of fact based on the evidence presented at trial. Specifically, he argues that the court erroneously stated that Beckworth struck and shot Thweatt, and that the court incorrectly stated that the murder weapon had been seen in Beckworth's truck several days before the murder. These allegations were not presented to the trial court, so we review them for plain error. We find no plain error.
In the summary of facts of the crime set out in the sentencing order, the trial court states that the defendants entered Thweatt's home, armed with a rifle, and that they cornered her in the kitchen. The order states that Thweatt was beaten about the head and then shot. (C. 991.) While, contrary to Beckworth's assertion, the court did not name Beckworth as the triggerman, the fact remains that the jury was charged on the legal theory of complicity, so even if Beckworth did not wield the murder weapon, he was guilty as an accomplice. The sentencing order does not incorrectly state the evidence presented at trial.
Beckworth contends that the sentencing order incorrectly states that the murder weapon was seen in his vehicle before the murder when, in fact, the testimony established that the vehicle belonged to codefendant Walker. The testimony presented at trial from Angela Foster indicated that a few days before the shooting, she looked in the trunk of the car Beckworth had been driving and saw the barrel of a gun that she believed to be a .22 caliber rifle or shotgun. (R. 594-95.) Beckworth told her that someone had given him the gun. She later testified that she thought the car belonged to Walker. (R. 598.)
The trial court's statement was made in its analysis of the  13A-5-51(4), Ala.Code 1975, mitigating circumstance, when it determined that Beckworth's participation in the crime was not relatively minor. The court stated, in relevant part:
"Defendant Beckworth even by his own statement was there in the house at the time of the killing. From other evidence it appears that he may have been *531 the one who obtained the weapon as he was in possession of it in his car trunk several days before the killing. He even requested a third party sometime prior to the killing to provide him or help him obtain a weapon which could not be traced indicating a preliminary intent to use the weapon in some illegal fashion."
(C. 993.)
Before his appeal, Beckworth did not object to this misstatement in the sentencing order, suggesting that he did not believe the misstatement was a serious error. This failure to object weighs against any claim of prejudice. Ex parte Borden, 769 So.2d 950, 955 (Ala.2000). While the trial court was technically incorrect when it said Beckworth's gun was in "his" car, any error was harmless. The point of the trial court's discussion was that Beckworth had obtained a weapon, apparently for illicit purposes, just days before the murder, and that he had secreted the weapon in the trunk of the car he was driving. The innocuous misstatement does not support a finding of plain error. Rule 45A, Ala. R.App. P.

F.
Next, Beckworth argues that the trial court erred when it failed to find additional nonstatutory mitigating circumstances based on the evidence he presented at sentencing. We disagree. We have repeatedly held, "The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance." Calhoun v. State, 932 So.2d 923, 975 (Ala. Crim.App.2005). The sentencing order establishes that the trial court considered all of the proffered mitigation. It found as nonstatutory mitigating circumstances that Beckworth "displayed a respectful demeanor at trial," that he attended church and engaged in church activities at one time, and that he loved his family and was loved by family members. (C. 994.) The trial court fulfilled its obligation to consider all evidence offered as potential mitigation.
To the extent Beckworth argues that the trial court gave more weight to the evidence presented by the State's witnesses at sentencing than it did to the evidence presented by defense witnesses, we note that Beckworth did not raise this objection at trial, and we review the claim now only for plain error. Alabama law consistently has held that the trial court is free to determine the credibility and weight of testimony presented at sentencing. E.g., Gavin v. State, 891 So.2d 907, 990 (Ala. Crim.App.2003). Thus, the fact that the trial court found some of Beckworth's proffered evidence not to be mitigating does not constitute error.
No plain error occurred as the result of the trial court's consideration of proffered evidence or as a result of its findings of nonstatutory mitigating circumstances. Beckworth is not entitled to any relief on this claim.[16]

XV.
Beckworth argues that the trial court erred when it denied his motion for a directed verdict because, he argues, "[w]ithout the wrongfully admitted statements by Beckworth, there was not legal evidence sufficient to convict Beckworth." (Beckworth's brief at p. 116.) His entire *532 argument on this claim consists of two sentences and contains no citation to legal authority. Although Beckworth has failed to comply with Rule 28(a)(10), Ala. R.App. P., we will review the claim. At the close of the State's case at trial, Beckworth moved for a directed verdict and argued that there was insufficient evidence to convict him. He did not argue the grounds now raised, so we review this claim for plain error.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr. App.1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original)."
Ex parte Woodall, 730 So.2d 652, 658 (Ala. 1998).
To the extent Beckworth is again arguing that the trial court erred when it denied his motion to suppress, we disagree for the reasons expressed in Part VIII of this opinion. Furthermore, applying the legal standard set out above, we find that the trial court correctly denied the motion for a directed verdict because the evidence was legally sufficient to send the case to the jury. The State's evidence, which is fully described earlier in this opinion, when considered in a light most favorable to the State, would have permitted a jury to find beyond a reasonable doubt that Beckworth participated in the capital murder of Bessie Lee Thweatt. Beckworth is not entitled to any relief on this claim.

XVI.
Beckworth's final argument is that the case should be reversed due to the due error.
The Alabama Supreme Court has set forth the cumulative-error rule as follows: "that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have `probably injuriously affected substantial rights of the parties,' then the cumulative effect of the errors may require reversal." Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001)(quoting Rule 45, Ala. R.App. P.). Applying this standard to Beckworth's allegation of cumulative error, we have carefully reviewed the record, and we do not find that an accumulation of individually non-reversible errors in this case "probably injuriously affected [Beckworth's] substantial rights" at trial.

XVII.
In accordance with Rule 45A, Ala. R.App. P., we have examined the record for any plain error with respect to Beckworth's capital-murder conviction, whether the error was brought to our attention or to the attention of the trial court. We find *533 no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Beckworth's sentence in accordance with  13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving the capital-murder conviction, we also review the propriety of the death sentence. This review includes our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Beckworth of the capital offense of burglary during the course of a murder, as charged in the indictment, a separate sentencing hearing was held before the jury in accordance with  13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances and after being properly instructed by the trial court as to the applicable law, the jury by a vote of 10-2 recommended a sentence of death. Thereafter, the trial court held another hearing, in accordance with  13A-5-47, Ala.Code 1975, to aid it in determining the appropriate sentence. The trial court ordered and received a written presentence investigation report, as required by  13A-5-47(b), Ala.Code 1975. In its sentencing order, the trial court entered specific written findings concerning the aggravating circumstance enumerated in  13A-5-49, Ala.Code 1975, that it found to exist, the mitigating circumstance enumerated in  13A-5-51, Ala. Code 1975, and the mitigating circumstances it found to exist under  13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Beckworth's participation in it.
In the sentencing order, the trial court found the existence of the following statutory aggravating circumstances: (1) that the murder of Bessie Lee Thweatt was committed during the course of a burglary, see  13A-5-49(4), Ala.Code 1975; (2) that Beckworth committed the crime while he was under a sentence of imprisonment, see  13A-5-49(1), Ala.Code 1975; and (3) that the murder was especially heinous, atrocious or cruel compared to other capital offenses, see  13A-5-49(8), Ala.Code 1975. The trial court found no statutory mitigating circumstances to exist. In accordance with  13A-5-52, Ala.Code 1975, the trial court considered the evidence Beckworth offered as nonstatutory mitigation; the trial court found the following to constitute nonstatutory mitigation: the defendant's respectful demeanor during trial, the defendant's participation in church activities, and the fact that he loved his family and was loved by family members. The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Beckworth to death.
*534 Although not raised by either of the parties, we note that the trial court failed to specifically address the  13A-5-51(1), Ala.Code, mitigating circumstance, regarding its determination of whether Beckworth had a significant criminal history. However, the trial court found as an aggravating circumstance that Beckworth was under sentence of imprisonment when he committed this capital murder. Therefore, we believe that is an implicit determination by the trial court that the  13A-5-51(1) mitigating circumstance did not exist. Furthermore, the presentence report considered by the trial court and included in the record establishes that Beckworth had six previous convictions over a 13-year period of time: 3 convictions for larceny, first degree; 2 convictions for burglary, third degree; and 1 conviction for escape, third degree. (C. 975.) His sentences on those convictions ranged from a 12-month suspended term to a term of 20 years. At the penalty phase of trial, Beckworth did not attempt to present evidence or sustain his burden of proving that this mitigating circumstance existed, nor did he argue to the jury or to the court that this mitigating circumstance applied in his case.
In a recent case presenting similar circumstances, we held that, although technically deficient, the sentencing order did not require a remand. Pilley v. State, 930 So.2d 550 (Ala.Crim.App.2005). The trial court in Pilley failed to mention two statutory mitigating circumstances. Although this Court determined that a remand was not possible because the circuit judge who tried the case was no longer on the bench, we further stated:
"Given these unique circumstances, we do not find it to be in the interests of judicial economy to remand this case for a new sentencing order, in light of the fact that the trial judge found the existence of no mitigating circumstances at Pilley's first trial and because Pilley presented no evidence in support of any of the statutory mitigating circumstances enumerated in  13A-5-51, Ala.Code 1975. Moreover, given that no evidence in the record supports the existence of the two mitigating circumstances the circuit court failed to address, we find the court's omission of these two mitigating circumstances to be harmless."
930 So.2d at 569.
In this case, although the trial judge has not retired from the bench, we find the trial court's technical defect in failing to mention the  13A-5-51(1) mitigating circumstance constitutes harmless error and does not rise to the level of plain error requiring a remand. Plain error is error that "has or probably has adversely affected the substantial right of the appellant." Rule 45A, Ala. R.App. P. Because the trial court considered all of the proffered mitigation, because it found as an aggravating circumstance that Beckworth was under a sentence of imprisonment when he committed this crime, and because there was no support in the record for this mitigating circumstance, it cannot reasonably be argued that the trial court's failure to state that it did not find this mitigating circumstance to exist has or probably has adversely affected his substantial rights. While we do not wish to be understood as condoning a trial court's failure to comply strictly with the requirements of  13A-5-47, Ala.Code 1975, we hold here that the failure to do so does not rise to the level of plain error.
The trial court's remaining findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.
Beckworth was convicted of murder made capital because it occurred during the course of a burglary.  13A-5-40(a)(4) *535 Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the State. See, e.g., Hall v. State, 820 So.2d 113, (Ala. Crim.App.1999), aff'd, 820 So.2d 152 (Ala. 2001). After carefully reviewing the record of the guilt phase and of the penalty phase of Beckworth's trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we find that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. We find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated herein, Beckworth's capital-murder conviction and his sentence of death are affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] James Walker was tried separately and was convicted for his participation in the burglary-murder. This Court affirmed his conviction and death sentence on appeal. Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004).
[2] The parties agreed to continue the proceedings on the motion for new trial past the 60th day following pronouncement of sentence. (C. 1144-46.) Rule 24.4, Ala. R.Crim. P.
[3] The record includes the transcripts of several pretrial hearings. The hearings are separately paginated, so we will refer to them by using the date the hearing was held, followed by citation to the relevant page number.
[4] In fact, the record does not indicate that the charge preceded the capital murder; instead, Beckworth alleges in his motion for new trial only that Beckworth's father's arrest on sexual abuse charges preceded Beckworth's arrest in this case.
[5] Beckworth presents this claim again in another section of his brief. We will discuss the merits of the argument in Part III.B. of this opinion.
[6] Before trial, defense counsel argued that Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), required the jury to determine whether Beckworth was mentally retarded. (8/15/02 hearing, R. 15-19.) During the trial, the learned trial judge noted that he was bound by Atkins, even though he had no procedure to guide him in determining whether Beckworth was mentally retarded. The judge informed the parties that he was considering giving the jury a special interrogatory during the penalty-phase deliberations so the jurors could indicate whether they believed Beckworth was mentally retarded. The judge further stated that he intended to define mental retardation for the jury by reading the definition from the American Association for Mental Retardation (AAMR). (R. 660-62.) The AAMR definition of mental retardation was quoted by the United States Supreme Court in Atkins. The judge stated that he thought it was the safest course of action to take, and the parties agreed. We note that nothing in Alabama or federal law requires that this procedure be followed, but we note that the able trial court acted out of an abundance of caution while attempting to comply with the dictates of a newly announced rule of law. The jury determined that Beckworth was not mentally retarded. (C. 967.)
[7] In Morrow v. State, 928 So.2d 315 (Ala. Crim. App. 2004), we held that, until the Alabama Legislature establishes procedures for implementing Atkins, we would use the procedures established for post-conviction proceedings in Rule 32, Ala. R.Crim. P., as a framework for addressing Atkins issues. Rule 32 places the on the defendant the burden of proving by a preponderance of the evidence that he is entitled to relief. For this additional reason, Beckworth is not entitled to relief on his jury-instruction claim.
[8] Morrow v. State, 928 So.2d 315 (Ala.Crim. App.2004).
[9] The prosecutor had asked the venire if anyone knew a friend or family member who had been charged with a crime. (R. 46.)
[10] We question whether Beckworth has presented this claim adequately for this Court to review. He has quoted portions of the record, but has not included any substantive argument or citations to the authorities, which Rule 28(a)(10), Ala. R.App. P., requires.
[11] Valenza testified that Sewell died before the case came to trial. (8/15/02 hearing, R. 8.)
[12] The October 28, 2002, sentencing hearing is paginated separately. Citations to the hearing are denoted "S.," followed by the page number.
[13] To the extent Beckworth argues that he was not afforded the opportunity to rebut the statement, we disagree; he had the opportunity at the sentencing hearing but stated only his general objection to the contents of the report. See Musgrove v. State, 638 So.2d 1347, 1352 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993).
[14] We note, too, that Beckworth's argument as to this item is inconsistent with several other arguments he makes in this issue, because he argues that this information should have been included in the report, even though it was not presented to the jury at trial.
[15] In another paragraph of the sentencing order, the trial court noted: "There was no evidence either expert or otherwise that the defendant's behavior was affected by psychiatric symptoms at the time of the offense. The defendant's taped statement did not indicate any psychological problems or confusion." (C. 992.) We agree with the trial court's statements, and we find that they provide additional support for its determination as to the  13A-5-51(6) mitigating circumstance.
[16] Beckworth states that the trial court "precluded Beckworth from fully developing his mitigation evidence" at sentencing, but he does not cite any portions of the record or any legal authority. (Beckworth's brief at p. 116.) To the extent Beckworth is objecting to the court's limitation of testimony as to his daughter's alleged molestation, this claim is fully addressed in Part I.B. of this opinion.